UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Lavitta Galarde,<br><br>  Plaintiff,<br><br>v.<br><br>Park District of Oak Park,<br><br>  Defendant. | No. 23-cv-4624<br><br>Judge April M. Perry |

**OPINION AND ORDER**

Lavitta Galarde ("Plaintiff"), an employee of the Park District of Oak Park ("Defendant"), initiated this suit alleging retaliation and racial discrimination in violation of 42 U.S.C. § 1981. In Count I, Plaintiff alleges that Defendant failed to promote her as retaliation for Plaintiff's report accusing a coworker of discriminating against a customer. In Count II, Plaintiff alleges Defendant also failed to promote her because of her race. And in Count III, Plaintiff alleges that she was subjected to racial discrimination by way of a hostile work environment. Defendant now moves for summary judgment. For the reasons that follow, the Court grants Defendant's motion.

**BACKGROUND**

Plaintiff, an African American woman, has been employed by Defendant since July 7, 2021, as a customer service specialist. Doc. 34 at 2; Doc. 45 at 1. When Plaintiff was hired, Stacey McNamara was Plaintiff's direct supervisor. Doc. 34 at 4; Doc. 45 at 1. Plaintiff mainly worked at one of two facilities: the Gymnastics Recreation Center ("GRC") or the Ridgeland Common Recreation Complex ("RCRC"). Doc. 34 at 3–4; Doc. 45 at 2.

1

As a customer service specialist, Plaintiff handled tasks like guest registration, membership processing, and public relations. Doc. 34 at 3; Doc. 45 at 1–2. Plaintiff's job also included cleaning restrooms, and Plaintiff was tasked with doing so from her first month on the job. Doc. 34 at 5; Doc. 44 at 1. Several other employees, including managers and supervisors, were also tasked with cleaning the bathrooms. Doc. 34 at 5; Doc. 45 at 2. Plaintiff testified, however, that two other guest services specialists working at the GRC were not tasked with cleaning the bathrooms. Doc. 34-2 at 110–11.

In October 2021, McNamara resigned from her supervisory position. Doc. 34 at 4; Doc. 45 at 2. That same month, Kayla Lindgren (McNamara's direct supervisor) suggested to Plaintiff that Plaintiff consider applying for the position. Doc. 44 at 2. On October 27, Plaintiff applied. Doc. 34 at 6; Doc. 45 at 3. On November 10, Defendant interviewed Plaintiff for the position. Doc. 34 at 6; Doc. 45 at 3. The following day, an outside candidate, Robert Pedroza, a Hispanic man, was also interviewed. Doc. 34 at 6; Doc. 45 at 3. On November 13, the Park District offered Pedroza the job, with a start date of December 6. Doc. 34 at 7; Doc. 45 at 3. Plaintiff had not heard back about the position and was not aware that Pedroza had been selected until December 13, when she met him at the RCRC. Doc. 44 at 2.

On December 11—after Pedroza had started but before Plaintiff knew he had been hired—Plaintiff observed an administrative assistant interacting with an African American customer. Doc. 44 at 2–3. Plaintiff states that during the interaction, Plaintiff was on the phone with a guest and overheard the administrative assistant tell the customer that she could not help her and to see Plaintiff instead. *Id.* The customer waited for Plaintiff to become available. *Id.* Another non-African American guest then approached the administrative assistant, who assisted the new customer while the previous customer continued to wait for Plaintiff. *Id.* Plaintiff's call

2

ended, and she began helping the first customer. *Id.* Eventually, the administrative assistant came over to help, prompting the customer to ask why she had not done so from the start. *Id.* at 2-3.

The following day, Plaintiff emailed Lindgren and Lindgren's supervisor about the incident, stating that the administrative assistant had treated the customer differently based on the customer's race. *Id.*; Doc. 34 at 8; Doc. 45 at 4. The following day, the director of human resources emailed Plaintiff informing her that Defendant takes all allegations of discrimination seriously and asking Plaintiff to meet with human resources. Doc. 34 at 8–9; Doc. 45 at 3–4. After meeting with Plaintiff and reviewing video footage and an email from the customer, the human resources department was not able to substantiate Plaintiff's allegations. Doc. 34 at 9; Doc. 45 at 4. Plaintiff was never informed of the results of the investigation. Doc. 45 at 4; Doc. 44 at 3.

Over the next two years, Plaintiff had several negative experiences with Defendant that she believes were retaliation for her report of discrimination. Those instances of alleged retaliation include:

- Lindgren and another manager at GRC stopped sharing family pictures and engaging Plaintiff in friendly conversation. Doc. 44 at 3.

- In March 2022, a different GRC manager repeatedly interrupted Plaintiff when Plaintiff was speaking with customers. Doc. 44 at 3.

- In April and November 2022, Defendant did not notify Plaintiff that coworkers had contracted COVID-19. Doc. 34 at 10–11; Doc. 45 at 5. Plaintiff believes she should have been notified because she was in close contact with one of the sick coworkers. Doc. 34 at 10–11; Doc. 45 at 5.

- In December 2022, Plaintiff was speaking with her GRC supervisor about students coming from Christ the King High School to work for Defendant. Doc. 44 at 4. That supervisor joked that another supervisor had said all the students looked alike. *Id.* Plaintiff testified that Christ the King High School is a predominantly Black high school. Doc. 34-2 at 334.

- That same month, Pedroza criticized Plaintiff by suggesting she not say "I believe" when speaking to customers. Doc. 34 at 11; Doc. 45 at 5. Plaintiff does not know whether Pedroza had been made aware of Plaintiff's discrimination complaint. Doc. 34 at 11; Doc. 45 at 5.

- Also in December 2022, Pedroza requested a meeting with Plaintiff, stating, "This will be good for you." Doc. 44 at 4.

- In February 2023, Plaintiff parked in the front parking lot reserved for customers. Doc. 34 at 12; Doc. 45 at 5. Employees can only park in the front lot if they are working a certain shift. Doc. 34 at 11; Doc. 45 at 5. Plaintiff's coworkers, however, would ask her why she did not park in the front lot and Plaintiff observed coworkers parking there "most days." Doc. 34-2 at 251, 259. The day Plaintiff parked in the front lot, Lindgren sent an email to all employees reminding them not to park in the front lot but did not specifically discipline Plaintiff. Doc. 34 at 12–13; Doc. 34-2 at 250–261; Doc. 45 at 5. Plaintiff was, however, asked to move her car. Doc. 34-2 at 255. Lindgren testified that she did not knowingly allow any employee to park in the front lot in violation of the policy, and that when she observed an employee breaking the parking rule, she would ask them to park on the street or tell their supervisor. Doc. 34 at 12–13.

4

In March 2023, Plaintiff completed an anonymous employee relations survey administered by Defendant. Doc. 34 at 13–14; Doc. 45 at 6. In her survey responses, Plaintiff complained that Lindgren should have provided more information to customer service employees about an incident during which an intruder came into the RCRC. Doc. 34 at 14; Doc. 45 at 6. Plaintiff was also critical about a cooking class Defendant cancelled earlier that year. Doc. 34 at 14; Doc. 45 at 6. The cooking class was to be hosted by an outside vendor and was titled "The Transatlantic Slave Trade" but was renamed and ultimately cancelled in response to public criticism. Doc. 34 at 14; Doc. 45 at 6. None of Plaintiff's direct or indirect supervisors were made aware of Plaintiff's survey responses. Doc. 34 at 15; Doc. 45 at 6.

Plaintiff believes that several negative experiences she had with Defendant in the following months were retaliation for her survey responses and for her 2021 report of discrimination. Specifically, Plaintiff complains that:

- In March 2023, Defendant purchased lunch for all staff at RCRC. Doc. 34 at 15; Doc. 45 at 7. The employee who was organizing the lunch offered to bring a sandwich to one of Plaintiff's coworkers but not Plaintiff, and did not acknowledge Plaintiff when speaking to her coworker. Doc. 34 at 15; Doc. 45 at 7.

- In April 2023, Defendant provided pizza to all employees who had volunteered for a specific event. Doc. 34 at 16–17; Doc. 45 at 7. The day pizza was provided, Lindgren made sure RCRC had pizza available but did not invite Plaintiff, who was working at the GRC that day. Doc. 34 at 16–17; Doc. 45 at 7; Doc. 34-2 at 238–43. Lindgren testified that employees who were not at the RCRC were invited to pick up pizza from the main office. Doc. 34 at 17; Doc. 45 at 7.

- In early 2023, Pedroza resigned and was replaced by Keely Garbacz, who became Plaintiff's new supervisor. Doc. 34 at 13; Doc. 45 at 6. In August 2023, Plaintiff heard Garbacz making disparaging comments about students from Christ the King High School such as that they "didn't even know how to talk." Doc. 34 at 17–18; Doc. 45 at 8. Garbacz also mimicked students speaking and said that she "couldn't even pronounce their names." Doc. 34 at 17–18; Doc. 45 at 8.

- At times starting in March 2023 and lasting through August 2023, Plaintiff was dissatisfied with changes to her schedule. Doc. 44 at 4–5. In March, Plaintiff was missing an hour and her shift was changed from working mornings to working nights without notice. *Id.* at 4. Around that time, a new supervisor had taken over scheduling and received multiple complaints from several employees about failing to account for employees' preferences. Doc. 34 at 19; Doc. 45 at 8. When Garbacz started in April, she too failed to schedule multiple employees for their preferred schedules, resulting in employees bringing scheduling concerns to her attention. Doc. 34 at 19; Doc. 45 at 8. In July, Plaintiff's preferred shift was given to a worker with less seniority. Doc. 44 at 4. Plaintiff's concerns were eventually resolved. Doc. 34 at 19; Doc. 45 at 8.

- In April 2023, Plaintiff again heard a supervisor demean the high schoolers from Christ the King High School, including by stating that she could not pronounce their names and mimicking their speech. Doc. 44 at 5.

- Finally, Plaintiff states that the director of HR was repeatedly dismissive towards Plaintiff via email. Doc 34-2 at 299–302.

During these time periods, Plaintiff twice received positive performance evaluations and merit pay increases. Doc. 34 at 9, 17; Doc. 45 at 4, 8. In January 2023, Plaintiff told Pedroza that

6

she could no longer clean the bathrooms because of a physical limitation, and thereafter was not asked to clean the bathrooms. Doc. 34 at 10; Doc. 45 at 5.

## LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. Material facts are those which "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to material facts is genuine "if the evidence is such that a reasonable jury" could resolve the dispute by returning a verdict for the nonmoving party. *Id.* The moving party bears the initial responsibility of identifying the "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(c). Ultimately, however, the party who bears the burden of proof on any issue may not rest on the pleadings and must affirmatively present some evidence to support its claims. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). At the summary judgment stage, the court considers the evidence in the light most favorable to the nonmoving party. *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 690 (7th Cir. 2010).

## ANALYSIS

Before turning to the merits of the motion, the Court addresses the summary judgment pleadings: Plaintiff filed several documents in response to Defendant's motion, most of which do not comply with Local Rule 56.1 or were filed late. *See* Docs. 36–45. Local Rule 56.1 exists, however, "not to make busywork but instead to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's

7

position on each of these questions." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020) (internal citation omitted). Consistent with this purpose, district courts have "broad discretion" to relax or strictly enforce local rules governing motion practice. *See Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 770 (7th Cir. 2013). Despite several technical deficiencies, Plaintiff accomplished much of what is asked of nonmovants in response to a motion for summary judgment. Most importantly, when disputing a fact, Plaintiff generally identified the fact in dispute and pointed the Court to relevant evidence in the record supporting the dispute. *See* Doc. 45. The Court will therefore excuse the technical deficiencies with Plaintiff's response. However, it appears that Plaintiff also drafted a statement of additional facts that she neglected to file on the docket. The Court is only aware of Plaintiff's statement of additional facts because Defendant filed a response to it after receiving a copy via email. *See* Doc. 47. This error will not be excused, and the Court will not consider Plaintiff's statement of additional facts or Defendant's response. Finally, Plaintiff did not submit a memorandum of law styled as such. Instead, she filed a one-page document titled "Legal Argument" containing two case references and some statements of law but little to no argument as to how the evidence warrants denying Defendant's motion or how the facts amount to a cause of action. Doc. 43. Given Plaintiff's *pro se* status, the Court will consider this document and will attempt to supplement it where appropriate based upon what Plaintiff's theory of her case was in her amended complaint. Doc. 2.

The amended complaint asserts three claims. *Id*. The first two claims allege that Defendant failed to promote Plaintiff to a supervisory position because of Plaintiff's 2021 report of discrimination against a customer (Count I) and because of Plaintiff's race (Count II). Count III advances a claim for hostile work environment harassment on the basis of Plaintiff's race.

Although the amended complaint brings all three claims under 42 U.S.C. § 1981, Plaintiff asks to proceed under 42 U.S.C. § 1983.[1] Doc. 43. Even allowing Plaintiff to proceed under Section 1983, however, the claims do not survive summary judgment.

Beginning with Count I, the undisputed facts establish that Pedroza was hired for the supervisory role Plaintiff wanted on November 11, and Plaintiff's complaint of discrimination was on December 13. Given that the alleged retaliatory act of failing to promote Plaintiff preceded Plaintiff's complaint, no reasonable jury could find in favor of Plaintiff's retaliation claim. *See Stutler v. Illinois Dep't of Corr.*, 263 F.3d 698, 702 (7th Cir. 2001) (noting that elements of retaliation claim include a causal link between the protected activity and adverse employment action); *Cervantes v. Ardagh Group*, 914 F.3d 560, 566 (7th Cir. 2019) (holding that no claim for retaliation is possible when employer did not know of protected activity). Plaintiff advances no discernable argument as to how Count I nonetheless survives. The Court therefore grants summary judgment to Defendant as to Count I.

As for Count II, Plaintiff appears to have abandoned this claim. In her deposition, Plaintiff testified that her non-promotion to the supervisory position was not because of her race. Doc. 34-2 at 274 ("Question: Are you alleging that you weren't promoted in December of 2021 because of your race? Answer: No."). Moreover, in her response to Defendant's statement of undisputed facts, Plaintiff admitted that she was not alleging that Defendant failed to select her for promotion because of race, but instead because of her complaint about the administrative assistant's discrimination. Doc. 34 at 8; Doc. 45 at 3. Finally, in her summary judgment papers, Plaintiff does not advance any discernible argument as to how the facts support a claim that she

---

[1] Plaintiff's pivot is a wise one, as the Supreme Court has held that Section 1983 is the sole cause of action for a plaintiff seeking damages from state actors who are alleged to have violated Section 1981. *Jett v. Dallas Independent Sch. Dist.*, 491 U.S. 701, 731 (1989).

was not promoted because of her race. Summary judgment in Defendant's favor is therefore appropriate as to Count II.

Plaintiff's third and final Count was originally a claim for hostile work environment harassment on the basis of Plaintiff's race in violation of 42 U.S.C. § 1981. Since then, however, Plaintiff has testified and admitted that much of the conduct she complains of was not because of her race. Doc. 34 at 11-17, Doc. 45 at 3, 5–7. Defendant identifies two instances of supposed harassment that Plaintiff's testimony indicates were allegedly based on race: observing the incident of customer discrimination in December 2021, and overhearing disparaging comments about students from Christ the King High School in early 2023. Doc. 33 at 10. However, the Court finds that these isolated occurrences do not amount to the kind of severe and pervasive treatment which constitutes unlawful racial harassment, *see Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 715 (7th Cir. 2021), and Plaintiff has offered no argument to support how they might. Indeed, it appears as though Plaintiff would prefer to abandon this count as well, advancing instead the claim that the harassment she suffered was retaliation for her discrimination report and survey answers. The Court gleans this from Plaintiff's deposition testimony, declaration submitted in support of her opposition to summary judgment, and from Plaintiff's legal argument, which, though it does not state the claim Plaintiff is advancing, refers to Plaintiff's First Amendment rights and appears to cite two cases involving protected speech and retaliation. *Lindke v. Freed*, 601 U.S. 187 (2024) (involving censorship on social media websites by city manager); *Gonzalez v. Trevino*, 602 U.S. 653 (2024) (involving retaliatory arrest claim).

District courts have discretion to allow *de facto* amendments to complaints during summary judgment briefing. *See Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852,

10

860 (7th Cir. 2017). However, when a party seeks to change legal theories at summary judgment, the court should consider whether the change would cause unreasonable delay or make the suit more costly or difficult and if so should reject the change. *Id.* Defendant here takes no issue with Plaintiff's change of course, and so the Court will proceed to address the merits of Plaintiff's new retaliation claim.

"Under Title VII, unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) (internal quotation marks and citation omitted). "The creation of a hostile work environment can be a form of retaliation." *Id.* at 567 n.5. A hostile work environment is one where an employee is subject to unwelcome harassment that is so severe or pervasive as to "alter the conditions of the employee's work environment by creating a hostile or abusive situation." *Id.* at 566. To make such a showing, Plaintiff must demonstrate that her work environment was both subjectively and objectively hostile. *See id.* Typically, there is no hostile work environment where harassment is directed at another, *see id.*, or where the harassment consists of isolated instances (unless extremely serious) occurring over prolonged periods of time, *see Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998) ("It is well established in this Circuit that there is a safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal.").

Here, the most salient feature of the supposed harassment is its lack of severity. Most of Plaintiff's complaints involve interactions with supervisors who behaved in an unfriendly, dismissive, micro-managing, or overly-critical way towards Plaintiff. Such conduct is not actionable. *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 463 (7th Cir. 2021) ("[That] a supervisor was standoffish, unfriendly, and unapproachable does not establish an objectively hostile work

environment." (cleaned up)); *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (finding that unfair criticism and micro-managing did not create an objectively hostile work environment).

Additionally, much of the mistreatment Plaintiff alleges was not specific to Plaintiff. For example, scheduling errors were felt by multiple employees during a leadership transition. Therefore, no reasonable inference can be drawn that Plaintiff's schedule changes were retaliation for Plaintiff exercising a protected right. Similarly, to the extent Plaintiff was tasked with cleaning the bathrooms, she had been doing so well before she engaged in any protected activity.

The closest Plaintiff gets to a hostile work environment are the comments she heard about students from Christ the King High School. However, those comments occurred at most on three occasions and did not involve the use of racial epithets, nor were they directed at Plaintiff herself. *See Smith v. Ne. Illinois Univ.*, 388 F.3d at 566 (finding that plaintiff was not subjected to an objectively hostile work environment when plaintiff was told second-hand that other employee repeatedly used racial epithets and only once, over several years, heard employee use the phrase "black motherfuckers" directed at another). Moreover, there is no indication that these comments were in response to Plaintiff's 2021 report of discrimination or 2023 survey responses. *See Vesey*, 999 F.3d at 461 (discussing requirement that there be a causal link between adverse action and protected activity). Plaintiff has therefore failed to establish that she was subject to a hostile work environment or otherwise experienced adverse employment action as a result of her report of discrimination or survey responses. The Court therefore finds that summary judgment is appropriate in Defendant's favor as to Count III.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.

Dated: July 24, 2025

 _____
 APRIL M. PERRY
 United States District Judge